## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

**UNITED STATES OF AMERICA**

    **vs.**                      **Civil Case No. 3:08-cv-00105-MHP**
                                **Criminal Case No. 3:02-cr-00044-MHP-2**

**GUY ROLAND SEATON,**

_____/

## DEFENDANT SEATON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE PLEA, JUDGMENT AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Comes now the defendant, GUY ROLAND SEATON, by his undersigned counsel, William Mallory Kent, and files this memorandum of law in support of his motion to vacate his plea, judgment and sentence pursuant to 28 U.S.C. § 2255.

### OVERVIEW OF CASE

Prior to his indictment in this action, Guy Roland Seaton ("Seaton") was the owner and Chief Executive Officer of St. Luke's Subacute Hospital and Nursing Centre, Inc, a nursing facility in San Leandro, California.   At trial, former employees testified that Seaton instructed them to falsify nursing schedules, payroll reports, and time-cards to support Medicare reports.   They also testified that Seaton instructed them to create a fictitious floor plan that segregated Medicare patients from

non-Medicare patients and to tell auditors, falsely, that St. Luke's assigned more-expensive registered nurses to Medicare patients and less-expensive licensed vocational nurses to non-Medicare patients.

Seaton and the corporation were indicted on May 8, 2001.  Count one - the conspiracy count - alleged that Seaton and the corporation inflated their cost reports and fabricated payroll reports, time-cards, and nursing schedules;  submitted false cost reports for 1996, 1997, and 1998;  created false nursing logs and schedules in preparation for a Medicare audit;  and made false statements to auditors from Mutual of Omaha, a fiscal intermediary acting on behalf of the Medicare program, during its audit.  Counts two, three and four - the false-claims counts - charged Seaton and the corporation with submitting false cost reports for 1996, 1997, and 1998.  Counts five and six were related to the audit by Mutual of Omaha and charged Seaton and the Corporation with making the false statement that "certain nurses worked 100% of their time on Medicare patients" (Count five) and obstructing a federal audit by failing to furnish the actual nursing schedules necessary to assure proper payment by the Medicare program (Count six).

A jury returned a guilty verdict on all counts, and this Court sentenced Seaton to 78 months' imprisonment and three years' supervised release and sentenced the corporation to probation.  Seaton appealed and was released on bond pending his

appeal. On May 5, 2006, the Ninth Circuit issued a written ruling affirming Seaton's conviction and sentence. *United States v. St. Luke's Subacute Care Hosp., Inc.*, 178 Fed.Appx. 711, 2006 WL 1208123 (9th Cir. 2006). On July 14, 2006, the Ninth Circuit denied Seaton's petitions for panel rehearing and for rehearing en banc. On July 21, 2006, the Ninth Circuit granted Seaton's motion to stay the mandate 'until final disposition by the U.S. Supreme Court.' On January 8, 2007, the Supreme Court denied Seaton's petition for a writ of certiorari. __ U.S. __, 127 S.Ct. 985, 166 L.Ed.2d 711 (2007). He petitioned for rehearing, and rehearing was denied. *St. Luke's Subacute Hosp. and Nursing Centre, Inc. v. United States*, 127 S.Ct. 1394, 167 L.Ed.2d 175, 75 USLW 3457 (U.S. Feb 26, 2007) (NO. 06-671). Seaton was then ordered by this Court to surrender to begin serving his 78 month sentence.[1] This

---

[1] After the mandate issued on February 26, 2007, Seaton moved to have the Ninth Circuit vacate this Court's order to surrender. Seaton argued in his *pro se* pleading that:

> Mrs. Seaton [his wife of many years] is suicidal. Mrs. Seaton's [sic] is in liver failure that puts her in precarious health and constant need of her husband as her caregiver and support person. Mr. Seaton's immediate incarceration with[out][sic] arrangement for proper care and support, Mrs. Seaton would surely die. Mr. and Mrs. Seaton live alone. Mr. Seaton is 64 years old Mrs. Seaton is 67 years old. Their only source of income is their social security payments. Mrs. Seaton will lose the benefit of Mr. Seaton's Social Security benefits when Mr. Seaton is incarcerated. Mr. Seaton is the sole care giver to Mrs. Seaton. Mrs.

petition followed in a timely manner.

## ARGUMENTS

**1. Testimony of Government Witness Who Interpreted Medicare Requirements Without Being Qualified as an Expert Witness under Rule 701 - Counts One Through Six - Seaton Received Iaac from His Appellate Counsel Who Failed to Object to the Testimony of a Government Witness Who Testified about His Understanding of Medicare Regulatory Requirements (Medicare Regulations and Implementing Program Manuals) Without Being Qualified to Do So as an Expert Witness under Rule 701 - Counts One Through Six.**

Seaton's defense at trial was that the governing Medicare regulations required reasonable, equitable allocation of costs between Medicare and non-Medicare patients, and did not require actual time records, and that Seaton had in fact satisfied

---

Seaton is suffering from end-stage liver disease.

*U.S. v. St. Luke's Subacute Care Hosp., Inc.* 478 F.3d 1088, 1089 (9th Cir. 2007).

Mrs. Seaton has since passed away. We bring this to the Court's attention because the Court may have labored under the misimpression that Mr. Seaton was attempting to deceive the Court about his wife's medical condition. That was not the case. She was in fact dangerously ill. His emotional distress when confronted with his inability to continue to care for his wife and his fear about the effect his incarceration would have on her health resulted in his emotional and physical breakdown and failure to surrender as ordered.

4

the equitable allocation rule contained in the regulations.

Special Agent Steven Lack was the case agent for this investigation and trial. He sat at counsel table in the trial and was the Government's first witness and also testified in the Government's rebuttal case. Agent Lack was not offered or qualified as an expert witness in Medicare regulations, yet he offered what amounted to expert opinion testimony giving his opinion whether Seaton had equitably allocated Medicare and non-Medicare nursing costs. Seaton's trial counsel objected to Lack's expert testimony. The issue was not raised on appeal.

Lack testified as follows:

11                 DIRECT EXAMINATION

12 BY MS. BESSETTE:

13 Q.  SPECIAL AGENT LACK, WHERE ARE YOU EMPLOYED?

14 A.  AT THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

15 OFFICE OF INSPECTOR GENERAL.

16 Q.  AND WHAT IS YOUR POSITION THERE.

17 A.  I'M A SPECIAL AGENT.

18 Q.  AND WHAT ARE YOUR DUTIES AS A SPECIAL AGENT?

19 A.   I INVESTIGATE ALLEGATIONS OF FRAUD AND ABUSE AGAINST THE

5

20 MEDICARE PROGRAM AND OTHER PROGRAMS OUR DEPARTMENT ADMINISTERS.

21 Q.  HOW LONG HAVE YOU BEEN A SPECIAL AGENT WITH THE OFFICE OF

22 INSPECTOR GENERAL INVESTIGATING HEALTH CARE FRAUD?

23 A.  17 YEARS.

24 Q.   WHAT EDUCATIONAL BACKGROUND DO YOU HAVE?

25 A.    I HAVE A BACHELOR'S AND MASTER'S IN PUBLIC ADMINISTRATION

306

 1 AND A DOCTORATE IN PUBLIC ADMINISTRATION WITH A SPECIALTY IN

 2 LONG TERM CARE FINANCING.

 3 Q.   DO YOU HOLD ANY CERTIFICATES?

 4 A.  I DO.

 5 Q.   AND WHAT CERTIFICATE DO YOU HAVE?

 6 A.   I'M A CERTIFIED FRAUD EXAMINER.

 7 Q.   WHAT DOES THAT MEAN?

 8 A.   THAT IS A SPECIALTY WHERE YOU EVER TO DEMONSTRATE

 9 EXPERTISE IN AN AREA, AND IN THIS AREA IT'S FRAUD EXAMINATION

10 SIMILAR TO A C.P.A.

6

11 Q.    DID YOU ACTUALLY TAKE AN EXAMINATION LIKE A C.P.A. WOULD

12 TAKE?

13 A.  NO.

***

 6   BY MS. BESSETTE:

 7   Q.  ARE YOU FAMILIAR, IN GENERAL, WITH THE MEDICARE

 8   REIMBURSEMENT PROCESS?

 9   A.  YES, I AM.

***

10   BY MS. BESSETTE:

11    Q.  NOW, MR. FOREMAN ASKED YOU ABOUT EQUITABLE ALLOCATION.

12   BASED ON YOUR INVESTIGATION HERE, DID THE DEFENDANTS EQUITABLY

13   ALLOCATE THEIR COSTS BETWEEN THE MEDICARE DISTINCT PART AND THE

14   NON-MEDICARE PART?

15        MR. FOREMAN:  OBJECTION, INADMISSIBLE LAY OPINION,

16   NO FOUNDATION, NO EXPERTISE.

17        THE COURT:  OBJECTION OVERRULED.

7

18        MR. FOREMAN:  AND SPECULATION.

19        THE COURT:  OBJECTION OVERRULED.

20        THE WITNESS:  NO, THEY DID NOT.  THEY INEQUITABLY,

21   OR, THEY DID NOT EQUITABLY ALLOCATE THEIR TIME.

. . .

11        THAT IS NOT -- THAT'S WRONG, AND THAT'S INEQUITABLE.

12        MR. FOREMAN:  I MOVE TO STRIKE THE CHARACTERIZATION

13   OF DOUBLE-BILLING. THERE'S NO CHARGE OF THIS. THIS IS SIMPLY

14   INADMISSIBLE LAY OPINION AND MISCHARACTERIZATION OF THE

15   EVIDENCE, YOUR HONOR.

16        THE COURT:  OBJECTION IS OVERRULED.

Lack was not qualified as an expert witness, therefore the opinion testimony

he gave if admissible had to be admissible as lay opinion.  Seaton argues that Lack's

testimony was not admissible as lay opinion.  Rule 701, Federal Rules of Criminal

Procedure provides that:

> [i]f the witness is not testifying as an expert, the witness' testimony in
> the form of opinions or inferences is limited to those opinions or
> inferences which are (a) rationally based on the perception of the
> witness, (b) helpful to a clear understanding of the witness' testimony or
> the determination of a fact in issue, and (c) not based on scientific,
> technical, or other specialized knowledge within the scope of Rule 702.

8

Fed.R.Evid. 701 (emphasis added).

In 2000, the drafters amended Rule 701 to foreclose lay witness testimony "based on scientific, technical, or other specialized knowledge"-testimony more properly given by a qualified expert.  In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing "the reliability requirements set forth in Rule 702 ... through the simple expedient of proffering an expert in lay witness clothing" and to "ensure[ ] that a party will not evade the expert witness disclosure requirements set forth in ... Fed.R.Crim.P. 16 by simply calling an expert witness in the guise of a layperson."  Fed.R.Evid. 701 advisory committee's note (2000).

To distinguish lay witness testimony from expert testimony, the Advisory Committee incorporated the Tennessee Supreme Court's treatment of the issue in *State v. Brown*, 836 S.W.2d 530, 549 (Tenn.1992).  Under *Brown*, lay testimony "results from a process of reasoning familiar in everyday life," whereas "an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *Brown*, 836 S.W.2d at 549 (citation omitted).  Accordingly, a lay witness could testify, for example, that "a footprint in snow looked like someone had slipped, or that a substance appeared to be blood."  Id. at 550 (internal citations omitted).  Yet, lay testimony is improper where it encompasses opinions that "call[

9

] for specialized skill or expertise"-such as a paramedic's testimony that skull trauma caused the bruises on a victim's face.  Id. at 550.

In *United States v. Cruz*, 363 F.3d 187, 189 (2d Cir.2004), the Second Circuit held that the district court improperly admitted expert testimony of a Special Agent for the Drug Enforcement Administration (DEA).   Because the DEA agent participated in surveillance of the drug operation at issue, the government called him as a fact witness at trial.  Id. at 193.   However, the district court permitted the DEA agent to proceed as though qualified as an expert and to testify to the meaning of the phrase "to watch someone's back" as used in a drug transaction.  Id. at 191, 193.   The DEA agent "relied on his expert opinion to interpret the meaning of the phrase ... after [the defendant] used those terms to describe his role" in the transaction, effectively drawing conclusions about the defendant's conduct.  Id. at 194.   The *Cruz* court concluded that the district court erred in permitting the DEA agent to offer expert opinions on the meaning of an ambiguous phrase, noting that the government had failed to proffer evidence that the phrase was used as a "drug code."  Id. at 197.  Additionally, the court found that, in any event, the district court "failed to fulfill its gatekeeping functions" by permitting the DEA agent to testify as though an expert when the government had not given notice under Federal Rule of Criminal Procedure 16.  Id. at 196 n. 2.

In *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir.2005), the Second Circuit explored the 2000 amendment to Rule 701 in some detail. At the outset, the *Garcia* court observed that "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." Id. (citing Fed.R.Evid. 701 advisory committee's notes (2000)). The drafters incorporated the "final foundation requirement ... to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard ... in Rule 702 and the pre-trial disclosure requirements set forth in Fed.R.Crim.P. 16." Id. The challenged testimony in *Garcia* was that of a DEA agent who had investigated the defendant's case and who testified at trial as to the defendant's role in the charged conspiracy. Id. at 210 (recounting the agent's testimony that "in his opinion, [Defendant] was a 'partner ... in receiving cocaine from [a supplier]' "). There, the court found the agent's testimony inadmissible under Rule 701 because "his reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking." Id. at 217.

The Fourth Circuit considered whether police officers properly testified as lay witnesses, having observed the defendant (a fellow officer) kick and injure a motorist who fled from a routine traffic stop, in *United States v. Perkins*, 470 F.3d 150,

151-52, 156 (4th Cir.2006). The officers testified "in terms of their eyewitness observations and particularized experience" to matters common in nature, which "required ... a limited amount of expertise." Id. at 156 (internal brackets and quotations omitted). Thus, the *Perkins* court held the testimony properly admitted under R. 701. In *United States v. Griffin*, 324 F.3d 330, 347 (5th Cir.2003), the Fifth Circuit considered claims that the district court erred in permitting the former director of the Texas Department of Housing and Community Affairs (TDHCA) to testify to the applicability of state law. The challenged witness "testified as to her understanding of the state ethics rules and what TDHCA employees were instructed about those rules." Id. at 347. The court found that although the witness's testimony met with the requirements of Rule 701, the district court erred in admitting it since it constitutes "[the witness'] own interpretation of the law." Id. at 347-48 (citing *Huff v. United States*, 273 F.2d 56, 61 (5th Cir.1959)).

Finally, in *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1217-18 (11th Cir.2003), the defendant shipping company objected to the lay testimony of plaintiff repair company's project manager and superintendent, which characterized plaintiff's repair charges as reasonable. According to the defendant, "any testimony as to 'industry standards' and reasonableness are necessarily precluded due to Rule 701's 2000 amendment." Id. at 1217. The

defendant similarly objected to testimony of the plaintiff's subcontractor, cost-estimating consultant, and chief executive officer. Id. at 1218-20. The *Cedar Shipping* court reviewed the 2000 amendment to Rule 701, along with the Advisory Committee's note, and concluded that "opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed." Id. at 1221-22. The court found that the plaintiff's owners, officers, and employees properly testified under Rule 701 because of their "particularized knowledge" acquired over years working with the business.

As the above authorities show, the Federal Rules of Evidence distinguish between lay and expert testimony, not witnesses. See Fed.R.Evid. 701; id. at advisory committee's notes (2000); Fed.R.Evid. 702. One witness may properly offer lay testimony and, at the same time, may be precluded from putting forth expert testimony. The district court erred when it allowed the case agent, Mr. Lack, to testify that St. Lukes had not equitably allocated its costs in compliance with the applicable regulation, without being qualified as an expert.

This was Seaton's sole defense, and to allow the Government case agent to offer his own personal opinion, in the guise of an expert though not qualified as such, that the defense was invalid, deprived Seaton of a fundamentally fair trial. Lack's testimony "require[d] [him] to apply knowledge and familiarity ... well beyond that

13

of the average lay person."    See *Ganier*, 468 F.3d at 925;  see also *Brown*, 836 S.W.2d at 550 (lay testimony is improper where it encompasses opinions that "call[ ] for specialized skill or expertise").

The Medicare program operates within a complex and intricate regulatory scheme beyond that for a layman to offer an opinion.  *Cf. United States v. Strange*, 23 Fed.Appx. 715, 717 (9th Cir.2001) (observing that testimony regarding Medicare regulations and reimbursement procedures was "entirely appropriate for an expert").  The case agent relied to a significant degree on specialized knowledge acquired over years of experience investigating Medicare cases.    See *Cruz*, 363 F.3d at 194.  Indeed, as in *Garcia*, "the government made no attempt to demonstrate that [the witnesses'] challenged opinion[s] [were] informed by reasoning processes familiar to the average person in everyday life rather than by ... technical, or other specialized knowledge."  See id. at 216.  Thus, the district court erred in permitting Agent Lack to effectively testify as experts without first being qualified.

Such error is not in all cases reversible;  rather, reversible error occurs only where the district court's erroneous admission of evidence affects a substantial right of the party.  See Fed.R.Crim.P. 52(a) ("Any error ... that does not affect substantial rights must be disregarded.");  *United States v. Basinger*, 60 F.3d 1400, 1407 (9th Cir.1995) (citation omitted). Agent Lack's testimony affected the substantial rights

14

of Seaton because it undermined Seaton's only defense, that is, that he had equitably

allocated the nursing costs between the Medicare and non-Medicare patients.

Seaton's trial counsel preserved this error for appellate review, by a timely and

specific objection, but Seaton's appellate counsel failed to raise the issue on appeal.

It was ineffective assistance of appellate counsel to fail to include this issue in the

appeal.

To satisfy a claim of ineffective assistance of appellate counsel ("IAAC")

under the Sixth Amendment to the United States Constitution, Seaton must satisfy

both prongs of the *Strickland v. Washington*[2] test. *See Smith v. Murray*, 477 U.S.

527, 535-536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (applying *Strickland* to claim

of attorney error on appeal). Seaton must first show that his counsel was objectively

unreasonable, see *Strickland*, 466 U.S., at 687-691, 104 S.Ct. 2052, in failing to argue

this issue on appeal, and he then has the burden of demonstrating prejudice. That is,

he must show a reasonable probability that, but for his counsel's unreasonable failure

to argue this issue, he would have prevailed on his appeal. *See Smith v. Robbins*, 528

U.S. 259, 285-286, 120 S.Ct. 746, 764 (2000). By definition, if the Court agrees with

the argument above that it was reversible error to admit the testimony of Agent Lack

---

[2] *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984).

as lay opinion, then Seaton meets the *Strickland* test for IAAC.

## 2. Indictment Failed to State an Offense - Counts One Through Four.

**Counts One Through Four Failed to State an Offense; Ineffective Assistance of Trial and Appellate Counsel[3] for Failure to Challenge Counts One Through Four on this Basis; 287 Is a False Claim Statute; Medicare Requires a Claimant to Claim a Reasonable Allocation of Costs for Reimbursement for Medicare Expenses; Medicare Does Not Require Hourly Timekeeping; the Government Failed to Prove That Seaton's Acr Was Not a Reasonable Allocation of Medicare Costs; Seaton Was Entitled to a JOA and Retrial Was Barred Due to this Error in the Charging Document and Proof at Trial Because the Indictment Itself Failed as Written to Charge the Crime and the Proof at Trial Was Legally Insufficient Even Had the Indictment Charged the Offense Properly.  This Should Have Been Argued as Plain Error on Appeal.**

Seaton's defense at trial was that the governing Medicare regulations required reasonable, equitable allocation of costs between Medicare and non-Medicare patients, and did not require actual time records.  The indictment and Government proof at trial focused on the failure to maintain accurate, contemporaneous time records and the falsification of time records during the subsequent audit.  Neither Seaton's trial counsel nor his appellate counsel appreciated the full significance of his defense, which was that it constituted a defense as a matter of law to the indictment as framed and the Government case as proved at trial. This defense should have been

---

[3] Throughout this memorandum we use the shorthand expression "ineffective assistance" or "ineffective assistance of counsel" ir "IAC" or "IAAC," by which we mean to raise a claim under the Sixth Amendment to the United States Constitution.

presented in the form of a pretrial motion to dismiss and in an argument on appeal challenging the facial validity of the indictment and the legal insufficiency of the evidence at trial.

The government presented substantial evidence that (1) the figures for nursing costs for Medicare patients entered on St. Luke's annual cost reports for 1996, 1997, and 1998 were not based on records adequate to support those figures; and (2) that when Mutual of Omaha initiated a 1999 audit of St. Luke's records in 1999, employees of St. Luke's altered records in order to better support the nursing cost figures entered on the ACRs for the previous three years, although the evidence whether defendant Seaton prompted or was aware of the alterations was in conflict.

The absence of adequate records bearing on nursing costs or even the alteration of such records simply did not constitute proof of § 287's prohibition on false claims. However sloppily the ACRs were prepared, the defense offered substantial evidence that St. Luke's reported nursing costs were reasonable, and that St. Luke's allocation of costs between the Medicare and non-Medicare portions of the facility was the "reasonable and equitable allocation'' required by Medicare regulations. The government, on the other hand, did not offer proof of what the actual nursing costs were. Furthermore, the mere act of listing a dollar figure on an annual report does not, in itself, constitute a claim for that much money, in part because claims above

and beyond the routine cost limits require a separate request for an exception and involve a separate and subsequent administrative approval process.

The foundation for this argument was presented in the initial direct appeal brief but instead of framing the issue as one of insufficiency of the evidence, which is what it was, appellate counsel turned it into an argument that there was instructional failure, that is, the failure to properly instruct the jury on the medicare regulations and materiality.

Counts Two, Three, and Four alleged three separate violations of 18 U.S.C. § 287, which prohibits submitting "any claim upon or against the United States... knowing such claim to be false, fictitious, or fraudulent." The "claims" alleged to have been submitted by defendants St. Luke's and Guy Seaton were "Medicare cost reports" for the years 1996, 1997, and 1998; each of these three annual cost reports ("ACR") was alleged to be false, fictitious, and fraudulent in that "the claimed nursing service costs did not reflect actual nursing costs for St. Luke's Medicare patients."

Appellate counsel noted that there appeared to be no reported cases involving a § 287 conviction based on an ACR containing false figures but failed to draw the proper conclusion from this record - - that the error in the case was much more fundamental than materiality - - the error was that the Government's indictment and

proof at trial simply failed to establish that the ACRs did not represent a reasonable allocation of the costs and as charged under 18 U.S.C. § 287, it was fatally flawed because the Government could not and did not show that the allocation of costs was not reasonable under the governing regulations, and that is what the Government was required to prove in order to prove that it was a false claim.

In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law. *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir.1994) (holding that the government bears the burden to negate any reasonable interpretations that would make the defendant's statement correct); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir.1991) (holding that one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction); *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir.1980) (same); *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir.1978) (same); see also *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir.1996) (noting that even though the Medicare regulations were clear regarding the royalty fees paid to a related party, the government failed to establish as a matter of fact that the fees claimed were actually in excess of what was clearly allowed under the regulations, and thus, had "failed to sustain its burden to prove the

claim false by virtue of the nonreimbursable nature of the interest").

The government did not meet its burden in this case because no Medicare regulation, administrative ruling, or judicial decision exists that clearly contradicted Seaton's method of allocating costs. See *United States v. Harris*, 942 F.2d 1125, 1132 (7th Cir.1991) (reversing conviction for willful false statement because the "usual sources of authority are silent" on the statement at issue).

Seaton was entitled to a dismissal either by way of pretrial motion or a Rule 29 at trial. It was ineffective assistance of counsel at trial and on appeal to not present this argument on these facts.

**3. Materiality Error - Counts One Through Four - Seaton's Trial Counsel Erred in Not Persisting in its Request for a Materiality Instruction on Counts Two Through Four and the Court Erred in Denying Seaton's Original Request to Instruct the Jury on Materiality as to Counts 2-4 and to Explain the Relationship Between Materiality on Counts Two Through Four and Count One, That Is, That Counts Two Through Four Were Object Offenses of Count One; as the Ninth Circuit Implied in Seaton's Direct Appeal, Materiality Is an Element of a 287 Offense; the Failure to Charge the Jury on Materiality Was Not Harmless Error, but Instead Prejudiced Seaton for IAC Purposes, Because as Properly Understood, under the Rationale Set Forth in Ground One Above, the Statements Were Only Material If They Failed to Represent a Reasonable Equitable Allocation of the Costs, Not If They Merely Failed to Reflect Contemporaneous Nursing Schedules for Nurses Assigned to Medicare Patients.**

Seaton's trial counsel initially requested a materiality jury instruction on Counts two through four, but then withdrew the request in response to an objection from the Government. Seaton's appellate counsel argued that the failure to give a

20

materiality instruction was plain error. The Ninth Circuit suggested, without

deciding, that Counts two through four required a materiality instruction, but declined

to find plain error. Had Seaton's trial counsel not abandoned the requested

instruction the issue would not have been subject to plain error review on appeal and

Seaton would have prevailed on this issue on appeal. This would have required the

reversal of Counts one through four *per se* and could have been used to argue spill-

over prejudice as to the remaining two counts which would have been subject to

reversal based on spill-over prejudice.

Seaton attempted to raise on appeal as plain error the trial court's failure to give

a materiality instruction as to counts two through four. The Ninth Circuit rejected the

argument stating as follows:

> Appellants contend that their convictions on Counts 2, 3, and 4 should
> be reversed because the district court failed to give the jury a materiality
> instruction under 18 U.S.C. § 287 . Although appellants proposed an
> instruction containing a materiality requirement, they withdrew it in
> response to the government's objection. The government argues that
> appellants therefore waived the issue under the doctrine of "invited
> error." See *United States v. Hugs*, 384 F.3d 762, 766-67 (9th Cir.2004).
> Our court has yet to resolve definitively whether materiality is required
> under § 287. See *United States v. Taylor*, 66 F.3d 254 (9th Cir.1995)
> (per curiam) (implicitly rejecting, without affirmatively holding, that
> there is no materiality requirement under § 287 ), cert. denied, 520 U.S.
> 1103, 117 S.Ct. 1105, 137 L.Ed.2d 307 (1997); see also *Li v. Ashcroft*,
> 389 F.3d 892 (9th Cir.2004) (stating, without affirmatively holding, that
> there is no materiality requirement under § 287 ).FN2 Consequently,
> there is no "known right" that appellants could possibly have waived.

See *United States v. Fiorillo*, 186 F.3d 1136, 1155 (9th Cir.1999). But neither is there plain error, since any instructional error is not "clear under current law." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); see also *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir.1997) ("When the state of the law is unclear at trial and only becomes clear as a result of later authority, the district court's error is perforce not plain."). Nor did the instruction undermine appellants' substantial rights or "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." *Fiorillo*, 186 F.3d at 1154 (internal citations and quotation marks omitted).

> FN2. We hesitate to read *Taylor* and *Li* as holding that there is no materiality requirement under § 287 given intervening Supreme Court decisions that accord greater weight to legislative history over and above statutory text. See *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that materiality is an element of 18 U.S.C. §§ 1341, 1343 and 1344 even though those statutes do not explicitly incorporate the term "material" because the legislative history indicates Congress intended to incorporate the common law meaning of "fraud," which included a materiality element); *United States v. Wells*, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (holding that there is no materiality element in 18 U.S.C. § 1014 because the term "material" was not included in the statute and the legislative history indicates that Congress intended to include non-material offenses).

*United States v. St. Luke's Subacute Care Hosp., Inc.*, 178 Fed.Appx. 711, 713-714, 2006 WL 1208123, *1 (9th Cir. 2006).

The Ninth Circuit was correct in rejecting the argument on plain error grounds.

It did not satisfy the plain error test, but Seaton was correct in his appellate argument

that materiality is an element of a § 287 claim.[4]

Counts Two, Three, and Four allege three separate violations of 18 U.S.C. § 287, which prohibits submitting "any claim upon or against the United States... knowing such claim to be false, fictitious, or fraudulent." The claims alleged to have been submitted by defendants St. Luke's and Guy Seaton were "Medicare cost reports" for the years 1996, 1997, and 1998; each of these three annual cost reports ("ACR") was alleged to be false, fictitious, and fraudulent in that "the claimed nursing service costs did not reflect actual nursing costs for St. Luke's Medicare patients.'' (ER 5)

There appear to be no reported cases involving a § 287 conviction based on an ACR containing false figures; on the other hand, there are cases in which a defendant has been convicted of violating 18 U.S.C. § 1001 due to the inclusion of false information on an ACR. *See, e.g., United States v. Garrison,* 133 F.3d 831 (11th Cir. 1998). When a charge of violating § 1001 is brought based on a statement made in an ACR, the government bears the burden of proving to the jury that the allegedly false statement was material, a necessary element of a false statement charge. *See United States v. Gaudin,* 515 U.S. 506 (1995) (hereafter referred to as *Gaudin II,* in order to distinguish it from this Court's earlier *en banc* opinion in the *Gaudin* case).

---

[4] The merits argument below is taken from Seaton's direct appeal brief.

23

In this case, the defendants proposed an instruction on the § 287 charges that required proof of three elements: (1) the presentation to an agency of the United States of a false or fraudulent claim; (2) knowledge by the defendant of the claim's falsity; and (3) "that the false or fraudulent claim was material." (ER 14; proposed 2) The defense also requested an instruction defining materiality: "A statement is material if it had the effect of influencing the action of the agency, or was capable of or had the potential to do so." (ER 18; proposed 6)

The government opposed the giving of these instructions in writing and no instruction on materiality was given as to Counts Two, Three, and Four. (ER 72-*28 73; RT 2257-58) Indeed, when instructing on materiality as an element of the Count Five false statement charge, the district court expressly stated by contrast the "false claims...do not require a showing of materiality." (ER 74; RT 2259)

The question of first impression thus raised by this case is whether the government can escape the burden of proving the materiality of an allegedly false statement in an ACR by charging a violation of § 287 rather of § 1001. Seaton claims it cannot for one of two reasons: (a) materiality is an element of all § 287 violations; or (b) even if a materiality instruction were not required in every § 287 prosecution, it would be required where, as here, the charged violation involves an ACR report, for in such cases a finding of the materiality is needed to ensure that the allegedly

false statement constitutes a "claim," a necessary element of the statute.

B. Materiality Is an Element of a § 287 Offense

Whether materiality is an element of a § 287 offense is an unsettled question of law in this Circuit. Prior to the Supreme Court's decision in *United States v. Gaudin,* 515 U.S. 506 (1995) (*Gaudin II*), this Circuit had held that the failure to give a materiality instruction in a § 287 prosecution is not error because in such cases, materiality is a question of law to be decided by the judge. The Supreme Court's ruling in *Gaudin* squarely overruled those earlier holdings.

Though this Circuit has in the past suggested that materiality is not an element of a § 287 offense, those suggestions predate *Neder v. United States,* 527 U.S. 1 (1999), which held that anti-fraud statutes implicitly include an element of materiality. As the Fifth Circuit has recognized, *Neder* logically applies to § 287 and thus overrules any previous determinations that materiality is not an element of the offense.

1. This Circuit's Ruling in *Taylor*

This Circuit came closest to addressing the issue of whether materiality is an element of a § 287 offense in *United States v. Taylor,* 66 F.3d 254 (9th Cir. 1995) (per curiam). The defendant in *Taylor* was convicted of making false statements in violation of both § 287 and § 1001. The district court refused to instruct the jury on

25

materiality under either provision. Based on this Circuit's earlier ruling in *United States v. Gaudin,* 28 F.3d 943 (9th Cir.1994) (en banc) ("*Gaudin I*"), the *Taylor* court held that the § 1001 conviction had to be reversed.

The defendant also argued that the rationale of *Gaudin I* also applied to § 287, but the court rejected his argument with respect to that statute.

> Taylor also contends that the same logic applied by the court in [*Gaudin I*] to 18 U.S.C. § 1001 applies to 18 U.S.C. § 287, and thus the district court's refusal to submit the materiality question to the jury mandates reversal of his convictions under 18 U.S.C. § 287. The reasoning of [*Gaudin I*] does not support its extension to 18 U.S.C. § 287.

> First, 18 U.S.C. § 1001 explicitly makes materiality an element of the offense, 18 U.S.C. § 287 does not. Second, this court has never held that materiality is an implicit element of 18 U.S.C. § 287. Finally, [*Gaudin I*] makes clear that "the issue of materiality in most [criminal perjury and false statement] statutes is a question of law for the judge. The exception has been section 1001 cases, in which we have held that it is an element of the crime that must be determined by the jury." [*Gaudin I*], 28 F.3d at 945.

*Id.* at 255 (alteration in original, footnote removed). The panel therefore affirmed Taylor's § 287 conviction.

*Taylor* relied on this Circuit's then-recent en banc decision in *Gaudin I* for the proposition that materiality is generally a question of law for the judge. As discussed below, the notion that materiality is a question of law for the judge was squarely rejected by the Supreme Court's ruling in its *Gaudin II* opinion. 515 U.S. at 522-23

("The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the materiality. .. infringed that right.").

Consequently, the assertion in *Taylor* that materiality under § 287 is a question of law for the judge is no longer good law. "[T]he Supreme Court's reasoning applies with equal potency to every crime of which materiality is an element. Accordingly, in every post-[*Gaudin II*] perjury-type case where we have reached the issue this Court has ruled that materiality, if an element, must be submitted to the jury." *United States v. Uchimura,* 125 F.3d 1282, 1284 (9th Cir. 1997). Following *Gaudin II,* if materiality is an element of a § 287 offense, it must be submitted to the jury.

Taylor also did not speak clearly on the issue of whether materiality is an element of a false claims offense. While the short per curiam opinion in *Taylor* cast doubt on the proposition that materiality was an element of § 287, it did not explicitly rule that materiality is not an element. The opinion held merely that § 287 is distinguishable from § 1001, and that even if materiality were an element of the offense, the failure to submit that element to the jury was not error. If *Taylor* did mean to hold that materiality is not an element of § 287, its holding, as demonstrated below, has been thoroughly undermined by the Supreme Court's subsequent ruling

27

in *Neder.*

2. Materiality as an Element of a § 287 Offense

a. Out-Of-Circuit Cases

There is currently a circuit split regarding the question of whether materiality is an element of a § 287 offense. The Fourth and Eighth Circuits have held that materiality is an element of the offense. *United States v. Snider,* 502 F.2d 645, 652 n.12 (4th Cir.1974); *United States v. Adler,* 623 F.2d 1287, 1291 n.5 (8th Cir. 1980). The Eleventh Circuit has declined to rule on the issue. *United States v. White,* 27 F.3d 1531, 1534-35 (11th Cir. 1994). The Second, Sixth, and Tenth Circuits had ruled to the contrary prior to *Neder. United States v. Elkin,* 731 F.2d 1005, 1009 (2d Cir.1984); *United States v. Nash,* 175 F.3d 429 (6th Cir. 1999); *United States v. Parsons,* 967 F.2d 452, 455 (10th Cir. 1992).

The most recent and most important of the sister circuit cases is the Fifth Circuit's ruling in *United States v. Foster,* 229 F.3d 1196 (5th Cir. 2000). The Fifth Circuit had previously ruled that materiality was not an element of the offense. *United States v. Upton,* 91 F.3d 677 (5th Cir. 1996). In *Foster,* however, the Fifth Circuit recognized that recent Supreme Court cases had undermined its previous holdings, and as a result, it signaled its intention to reverse course.

The defendant in *Foster* argued that the trial court had erred by failing to give

28

a materiality instruction for his § 287 conviction. The Court ruled that any error was harmless. 229 F.3d at 1196-97. The Fifth Circuit recognized, however, that the Supreme Court's decision in *Neder* had undermined its previous rulings on the issue: "we read *Neder* to require a materiality instruction and the better practice would be to give the instruction in a § 28 [sic] false claim offense." 229 F.3d at 1196 n.1.

b. Neder, Fraud, and § 287

The *Neder* Court examined "whether materiality is an element of a 'scheme or artifice to defraud' under the federal mail fraud (18 U.S.C. § 1341), wire fraud (§ 1343), and bank fraud (§ 1344) statutes." 527 U.S. at 19. Although none of those statutes "even mentions materiality," *id.* at 20, the Court concluded based on the history of the statute and the meaning of fraud at common law that materiality is an element of those offenses, *id.* at 21-23. "[W]e cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes." *Id.* at 23. Under *Neder,* materiality is a necessary element of the crime of fraud.

The reasoning of *Neder* applies with equal force to § 287 because § 287 is itself an anti-fraud statute. The statutory predecessors of § 287 were wartime anti-fraud statutes. The earliest version of the False Claims Act "was originally passed in 1863 after disclosure of widespread fraud against the Government during the War Between

the States." *Rainwater v. United States,* 356 U.S. 590, 592 (1958). "[T]he objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims ...." *Id.; see also United States ex rel. Marcus v. Hess,* 317 U.S. 537, 547 (1943) (stating that the purpose of the statutes was "to protect the government against war frauds"); *United States v. Cohn,* 270 U.S. 339, 347 (1926) (stating that the statutes proscribed "the fraudulent causing of pecuniary or property loss"); *United States v. Walter,* 263 U.S. 15, 17 (1923) (stating that early false claims statutes were aimed at "fraudulent claim[s]" against the government).

The legislative history of the statute confirms that Congress's aim was to prevent fraud against the government. Proponents of the early false claims act argued that the government was being "shamefully defrauded." Reports of Committee, 2d Sess. 37th Cong., Vol. 2, 1861-62. In describing the earliest false claims law, the law's Senate manager stated: "It is a bill to prevent and punish frauds upon the government of the United States; and I am very anxious to have it acted upon." Congressional Globe, 37th Cong. 3d Sess. 952; *see also United States v. McNinch,* 356 U.S. 595, 599-600 n.9 (1958) (quoting additional statements).

Section 287 was enacted as a re-codification of the earlier false claims laws; like its predecessors, it is an anti-fraud statute. It prohibits "fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White*

*Co.,* 390 U.S. 228, 233 (1968). It punishes defendants who use "fraudulent means to secure an unjustified monetary payment from the government." *United States v. McBride,* 362 F.3d 360, 369 (6th Cir. 2004).

Under *Neder,* even though a fraud statute does not explicitly mention materiality, materiality is an element of the offense. This is no less true for frauds under § 287 than for the other species of fraud. The Fifth Circuit was therefore correct in stating that *Neder* requires a materiality instruction for prosecutions under § 287. *Foster,* 229 F.3d at 1196 n.1. This court's failure to give the materiality instruction requested by the defense in this case was error.

C. In a § 287 Prosecution Based On An ACR, An Instruction On Materiality Is Required To Ensure That The Jury Finds That The Defendant Submitted A "Claim," a Necessary Element of The Statutory Offense

The leading Ninth Circuit case on the definition of a false claim is *United States v. Jackson,* 845 F.2d 880 (9th Cir. 1988), which holds that a claim is either a request for undeserved payment from the government or the submission of a form falsely asserting entitlement to government funds already received. "Submission of a form to obtain a credit for previously advanced government funds is as violative of § 287 as submission of a form to obtain the funds themselves, when the submission is 'false, fictitious, or fraudulent.'" *Id.* at 882.

In the case of a Medicare ACR, whether a figure on the cost report could possibly influence the government to pay out money is very much a question of fact. As reflected in both the trial testimony (RT 1324) and the case law, Medicare sets routine cost limits (RCL) for various categories of expenses and any claimed costs above those limits are presumed unreasonable and thus not subject to reimbursement. *Ashtabula County Med. Ctr. v. Thompson,* 352 F.3d 1090, 1092 (6th Cir. 2003); *St. Luke's Methodist Hosp. v. Thompson,* 315 F.3d 984, 985 (8th Cir. 2003); *Anaheim Mem'l Hosp. v. Shalala,* 130 F.3d 845, 847 (9th Cir. 1997). While there are some circumstances in which a provider could attempt to gain reimbursement for reported 'atypical' costs above the RCL, the process is complicated and there are circumstances in which "[t]hat provider does *not* have the opportunity to show that its costs were reasonable" and thus gain payment for them. *St. Francis Health Care Ctr. v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000) (emphasis added).

Government witness Potter described a cost report as "just a reporting mechanism *or* claim for payment." (ER 39; RT 1343) Whether the ACRs at issue here were merely reports or claims for payment turned on the factual question of whether the nursing cost figures which the government alleged to be false "had the effect of influencing the action of the agency" to pay out money, "or [were] capable of or had the potential to do so." In other words, in order for the statements on the ACRs to be

32

claims they had to be material; if the statements could not have led to the payment of governmental funds, or to the awarding of credit for funds already received by the provider, they could not meet the § 287 definition of a claim as a request or demand for money. Regardless of whether materiality is an element that must be instructed on in every § 287 prosecution, it was error to fail to give the requested instruction on materiality in this case.

D. The Instructional Error Requires Reversal On Counts Two, Three, and Four

This court not only failed to instruct on materiality in relation to Counts Two, Three, and Four, either as an independent element or as a necessary component of the 'claim' element; it affirmatively instructed the jury that as to those three counts they should not consider whether the allegedly false statements could have influenced agency action. (ER 74; RT 2259 ) Misinstruction on an element of a charged offense constitutes constitutional error requiring reversal unless the government can prove the error harmless beyond a reasonable doubt. *Neder,* 527 U.S. at 7-15.

There is ample evidence in this record from which a jury could have concluded that, given the complex negotiation procedures for approval of costs exceeding the routine cost limit, the yearly cost reports could not in themselves have led to the payment of, or credit for, undeserved Medicare funds, and thus were not "material" to the payment of a Medicare claim. The instructional error requires reversal of

33

Seaton's convictions on Counts Two, Three, and Four.

Had Seaton's trial counsel not withdrawn its request for the proposed materiality jury instruction and objected to this Court's misinstruction on materiality, the issue would have been preserved for appeal and would have been reversible error on appeal. Seaton's trial counsel rendered ineffective assistance of counsel under the Sixth Amendment because counsel's failure meets both prongs of the *Strickland* test, that is it was an unreasonable choice and the choice prejudiced Seaton at trial and on appeal.

**4.  *Yates* Multiple Objects Error - Count One - Seaton Received Iac and Iaac Because His Counsel Failed to Argue That Count One Was Fatally Defective Because it Charged Multiple Objects of the Conspiracy, That Is, That the Acrs (1) Contained False and Fictitious Direct Nursing Service Costs and (2) Misrepresented the Level of Nursing Care Provided to Medicare Patients, and That the Second Object of the Indictment Was Not a Crime under 287, Therefore the Indictment Was Legally Insufficient, Alternatively, as Charged, the 287 Offense Itself Was Not a Crime as Charged (See Ground Two Above), Therefore There Was No Legally Sufficient Object for the Conspiracy.  This Should Have Been Argued as Plain Error on Appeal.**

Count one of the indictment alleged that Seaton's conspiracy consisted of both (1) reporting false and fictitious direct nursing service costs and (2) misrepresenting the level of nursing care provided to medicare patients.  The jury was not required to return a special verdict as to which of these two objects of the conspiracy the jury reached unanimous agreement.  Even if reporting false direct nursing costs as such

is an offense under Section 287, misrepresenting the level of nursing care provided

patients is not a Section 287 offense.  There is no Medicare requirement at issue in

this case to report or not report the level of nursing care provided to patients, rather

the crime, assuming there could be a crime on these facts, was falsely reporting the

Medicare cost reimbursement amount.

Because misrepresenting the level of nursing care provided is not a crime as

a matter of law, one (if not both) of the objects of the charged conspiracy was legally

insufficient, and as such the conspiracy count must fall under the test announced in

*Yates v. United States*, 354 U.S. 298, 312 (1957) (stating that "we think the proper

rule to be applied is that which requires a verdict to be set aside in cases where the

verdict is supportable on one ground, but not on another, and it is impossible to tell

which ground the jury selected").

"[A] conspiracy conviction is "doom[ed]" if the indictment alleges both legally

sufficient and legally insufficient objects and there is "no way to know which objects

the jury relied on in its decision to convict [the defendants] of conspiracy."  *United

States v. Manarite*, 44 F.3d 1407, 1413-1414 & n. 7 (9th Cir. 1995) 1413-14.  See

*Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)

(noting that a general verdict cannot stand if the jury could have convicted on a

35

legally flawed theory).[5]

The Ninth Circuit has held in at least one unpublished decision that a *Yates* error is plain error:

> The jury returned general verdict forms. We cannot determine which "object" of the conspiracy the jury relied on in reaching its verdict. Because the jury could have relied on object number three, the conspiracy conviction is legally unsupportable. See *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (stating

---

[5] In *Griffin*, the Supreme Court applied the *Yates* harmless error test to legal errors in instructing a jury and the *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), harmless error test to instructional errors concerning the weight of the evidence. *Griffin*, 502 U.S. at 59-60, 112 S.Ct. 466. Under the *Turner* rule, " '[w]hen a jury returns a guilty verdict on an indictment charging several acts ..., the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " *Griffin*, 502 U.S. at 56-57, 112 S.Ct. 466 (quoting *Turner*, 396 U.S. at 420, 90 S.Ct. 642). The Court distinguished the two errors by reasoning that[w]hen ... jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence. Id. at 59, 112 S.Ct.

that "we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"), overruled on other grounds by *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

. . .

We already have explained that submitting a legally unsupportable theory to the jury was error. We conclude that the error was plain. The law in this area was settled at the time of trial by established Supreme Court precedent. *Yates*, 354 U.S. at 312, 77 S.Ct. 1064; *Fuchs*, 218 F.3d at 962 & n. 1 [*United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir.2000)]. Further, the error prejudiced Defendants' substantial rights because it appears to have affected the outcome of the proceedings, which relied heavily on Defendants' concerted activities within Montana. See *United States v. Olano*, 62 F.3d 1180, 1188 (9th Cir.1995) (stating standard). Finally, we hold that the real possibility that Defendants were convicted for acts that are not federal crimes is grounds for us to exercise our discretion to reverse for plain error. See id. at 1187. Because the conspiracy conviction may have rested on a legally insufficient ground, we reverse the conviction of all Defendants on count one.

*United States v. Johnson,* 44 Fed.Appx. 752, 754, 2002 WL 1334758, 2 (9th Cir. 2002).

Neither trial nor appellate counsel raised this issue. It was IAC to not object at trial and IAAC to not raise the issue as plain error on appeal. Had the error been objected to at trial this Court would have been required to grant a judgment of acquittal; if presented on appeal it would have been reversible, plain error. In either event the failure to raise the issue satisfies both the performance and prejudice prongs

37

of *Strickland*.

**5.  Statements Made in the Course of a Fiscal Intermediary's Internal Audit are Not False Statements for Purposes of Section 1001 - Count Five**.

**The Indictment Failed to State an Offense or Alternatively the Government Failed to Prove at Trial a Violation of Section 1001, When the Indictment Alleged and the Proof at Trial Showed That the Statements at Issue Were Made Solely to Private Auditors Working for Mutual of Omaha, a Fiscal Intermediary under the Medicare Program;  Accordingly, Seaton Received IAC and IAAC Due to the Failure of His Trial and Appellate Counsel to Challenge Count Five on this Basis, Because Statements Made in the Course of a Fiscal Intermediary's Internal Audit Are Not False Statements for Purposes of Section 1001.**

Seaton hereby abandons Ground 5.  *See United States v. White*, 492 F.3d. 380, 396 (6th Cir. 2007) (upholding § 1001 conviction for false statement made to fiscal intermediary under Medicare).  *See also United States v. Hames*, 185 Fed.Appx. 318 (5th Cir. 2006) (unpublished).

6.  **Mutual of Omaha Not a "Federal Auditor" For Section 1516 Purposes - Count Six**.

**Seaton Received IAC and IAAC as a Result of His Counsel Not Moving to Dismiss or Vacate the Conviction for Count 6 Based on the Arguments That (1) the Mutual of Omaha (Fiscal Intermediary) Auditor, Conducting an Audit for Mutual of Omaha, Is Not a "Federal Auditor" Conducting an Audit by or on Behalf of the Government, and (2) That in Any Event, Failing to Produce a Document, as Opposed to Producing a False or Fictitious Document, Cannot Constitute the Crime of Obstruction; it Does Not Obstruct an Audit to Not Produce a Needed Document, Assuming the Document Is Required, Rather it Results in an Audit Result Adverse to the Company Being Audited; this Should Have Been Argued as Plain Error on Appeal.**

Seaton hereby abandons Ground 6. *See* 42 C.F.R. § 405.902:

Fiscal Intermediary means an organization that has entered into a contract with CMS in accordance with section 1816 of the Act and is authorized to make determinations and payments for Part A of title XVIII of the Act, and Part B provider services as specified in § 421.5(c) of this chapter.

*United States v. Hames*, 185 Fed.Appx. 318 (5th Cir. 2006) (unpublished)

(finding reliance on *United States v. Plasser American Corporation*, 57 F.Supp.2d

140 (E.D. Pa. 1999)(holding audit for Amtrak not a federal audit for § 1516 purposes)

misplaced because a fiscal intermediary is a federal auditor for purposes of § 1516.

*See also United States v. McGovern*, 329 F.3d 247 (1st Cir. 2003) (same).

39

7.  **Failure to State an Offense - Count Six**.

**Failure to Produce Documents as Opposed to Production of Falsified Documents, Fails to State an Offense under Section 1516; Seaton  Received IAC and IAAC Based on the Failure of His Trial and Appellate Counsel to Challenge His Conviction on this Basis.**

Seaton hereby abandons Ground 7.  The Ninth Circuit has expressly held that the failure to produce records constitutes obstruction under related statutes that cannot meaningfully be distinguished from 18 U.S.C. § 1516 for purposes of this argument.  *United States v. Lench*, 806 F.2d 1443, 1445 (9th Cir.1986) (the failure to provide documents is a violation of section 18 U.S.C. § 1503); *United States v. Laurins,* 857 F.2d 529, 536 (9th Cir. 1988)(failure to produce record is similarly a crime under § 1505).

8.  **Abuse of Position of Trust - Sentencing - Seaton's Sentencing Counsel Rendered Iac in Not Advocating at the Final Sentencing Hearing That U.S.S.G. 3B1.3 (Abuse of Position of Trust) Did Not Apply to Seaton under *Garrison*; *Rutgard* Was Distinguishable.  To the Extent Counsel at Sentencing Did Not Properly Preserve this Objection, it Should Have Been Argued as Plain Error on Appeal.**

Seaton's trial counsel submitted a sentencing memorandum objecting to the application of the abuse of position of trust enhancement, but that sentencing memo articulated the objection on the basis that there was no loss, therefore there was no abuse of trust.  That argument was defective as a matter of law.  The sentencing memo also cited *United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998), without

40

explanation or elaboration together with a contrasting citation to the Ninth Circuit decision in *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997).

The *Garrison* case was squarely on point, holding that a nursing care provider could not be scored with abuse of position of trust for false cost reporting for Medicare reimbursement, because the care provider is not in a position of trust *vis a vis* the victim, that is the fiscal intermediary or Medicare.

The *Rutgard* case upheld an abuse of trust enhancement against a physician holding that the doctor was in a position of trust *vis a vis* his patients and the Government depended on that trust. *Rutgard* is consistent with numerous decisions that have applied abuse of trust enhancements to physicians because of the special relationship of trust between physician and patient.

There was no evidence in Seaton's case that he or his corporation abused the trust of their patients, therefore *Rutgard* was not on point.

At sentencing no argument was presented by the defense on this point, and this Court's abbreviated *sua sponte* discussion of the issue referred only to the stated objection that there was no loss therefore no abuse of trust. Seaton's sentencing counsel should have, but did not, argue the distinction between *Rutgard* and the facts of Seaton's case and explained that *Garrison* was on all fours. *See also United States v. Williams*, __ F.3d __, 2008 WL 2066095 (11th Cir. 2008) (following *Garrison*).

41

The abuse of trust enhancement requires a "bona fide relationship of trust." The term is described in a recent Sixth Circuit opinion. In reversing a trial court's enhancement for abuse of a position of trust, the Sixth Circuit stated:

> Clearly . . . the notion of 'trust' embodied in the guideline is not the one contemplated by the ordinary dictionary concept of reliance or confidence for, in that sense, a bank trusts its tellers not to steal from the till. Rather, *as used in the guideline, 'position of public or private trust' is a term of art, appropriating some of the aspects of the legal concept of a trustee or a fiduciary.*

*United States v. Ragland*, 72 F.3d 500, 502-03 (6th Cir. 1996) (emphasis supplied).

The Tenth Circuit concurred with the exacting standard of *Ragland* defining an abuse of public or private trust as incorporating aspects of the legal concept of fiduciary. In *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996), the Court held that, in the fraud context, U.S.S.G. § 3B1.3 is applied in two types of cases. The first is where an employee steals using his position in the company to facilitate the offense against his employer. The second is *where a "fiduciary or personal trust relationship exists" with other entities*, and the defendant takes advantage of the relationship to perpetuate or conceal the offense. *Koehn*, 74 F.3d at 201 (emphasis added).

Seaton was not a government employee, nor did a fiduciary or trust relationship exist between Seaton and the Government. Seaton and his corporation dealt with the

Health Care Financing Administration ("HCFA") through a fiscal intermediary. A provider, such as Seaton, who chooses to deal with a fiscal intermediary will be audited "as necessary" to ensure proper payments. 42 C.F.R. § 421.100(c). Obviously, there was no fiduciary relationship between Seaton, his corporation and HCFA; it was only a contractual fee for service business arrangement. In fact, less trust exists in the Medicare reimbursement program than in most private sector business relationships with the Government wherein invoices are submitted directly to the Government for payment without audit.

The fiscal intermediary's charge and mission is to ensure that the Government makes only proper payments to providers. The fiscal intermediary reviews cost reports before requests for reimbursement are paid. Audits of Medicare cost reports submitted by providers are mandated and are performed on a periodic basis. The fiscal intermediary may cause the immediate suspension of payments if it concludes that the provider has been overpaid or there is evidence of fraud. 42 C.F.R. § 405.370.

It is the absence of that relationship between Seaton and the Government which compels the finding that no abuse of position of trust enhancement is permissible.

Seaton's indirect relationship with HCFA, through his company's dealings with a fiscal intermediary, cannot seriously be compared to that of the physician in *Rutgard*. First, the Court in *Rutgard* noted that physicians enjoy a role of trust

respecting treatment for the patients and it is presumed that physicians are exercising those professional judgments in the patient's best interest; therefore, those judgments are given great deference. The deferential treatment provided to the physician's relationship of trust with his patients in *Rutgard* is in stark contrast to the arms-length relationship which existed between Seaton and his company and HCFA through its fiscal intermediary. Further, as stated above, the cost reports submitted by Seaton were subjected to greater scrutiny than traditional private enterprise contracts with the Government. See *United States v. Broderson*, 67 F.3d 452, 455 (2d Cir. 1995). Seaton's conduct is identical to that of *Broderson*. They both failed to file truthful reports to the Government. In the case of Broderson, it dealt with the applicable interest rate for a loan. In Seaton's case, it dealt with the submission of false cost reports for Medicare reimbursement. Seaton, like *Broderson* and *Garrison*, should not have received an abuse of position of trust enhancement because his company failed to file truthful reports to the Government's fiscal intermediary.

Therefore, this Court erred in enhancing Seaton's guideline range two levels pursuant to U.S.S.G. § 3B1.3. Unlike *Rutgard*, Seaton dealt with the Government at more than arms-length and through a watchdog fiscal intermediary. He was not afforded the great deference provided to physicians in their professional judgment for patient treatment, nor can his capacity at St. Luke's form the basis for the necessary

relationship of trust. Seaton must have a relationship of trust with the victim (Government), as the *Garrison, Ragland* and *Koehn* courts describe - - like that of a trustee or fiduciary.

It was ineffective assistance of counsel to not present this argument when the law was settled at the time in its favor; arguably the issue was inadequately preserved for direct appeal, but in either event his appellate counsel should have raised the issue but did not. Seaton is entitled to be resentenced without the application of the abuse of trust provision.

## 9. **Lack of Clear and Convincing Evidence of Loss - Sentencing**

**Seaton's Trial and Appellate Counsel Rendered IAC and IAAC When They Failed to Object to the District Court's Loss Determination Being Based on less than Clear and Convincing Evidence.**

Neither at sentencing nor on appeal did Seaton's counsel argue that the loss amount must be established by clear and convincing evidence. Then existing Ninth Circuit precedent required application of the clear and convincing standard of proof for sentencing factors that would have a disproportionate impact on the sentence. This continued to be the rule post *Booker*. In light of the disproportionate enhancement based on loss amount, the failure to apply the clear and convincing evidence standard was plain error. See *United States v. Jordan*, 256 F.3d 922, 930-31 (9th Cir.2001) (holding failure to apply the appropriate standard affected substantial

45

rights in circumstances similar to those presented here). It was ineffective assistance of counsel to not make this argument at trial or on appeal.

See *United States v. Kilby*, 443 F.3d 1135, 1140 n. 1 (9th Cir.2006) (noting that "[i]n some cases, where a sentencing factor would have an extremely disproportionate effect on the sentence, the government may have to satisfy a clear and convincing standard of proof"); *United States v. Dare*, 425 F.3d 634, 642 (9th Cir.2005) (noting, in a post-*Booker* review, that "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing," but, where an extremely disproportionate sentence results from the application of an enhancement, "'the government may have to satisfy a "clear and convincing" standard'" (quoting *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir.1999)); See also *United States v. Lynch*, another post-*Booker* case which applied the rule that "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the conviction, the government must prove such a factor by clear and convincing evidence." 437 F.3d 902, 916 (9th Cir.2006) (*en banc*) (*per curiam*).

Seaton was prejudiced because had the clear and convincing standard been applied, the Court could not have sustained the loss amount enhancement. On appeal, applying a preponderance standard the Ninth Circuit upheld the loss amount stating, "The district court's conclusions on this rather complicated matter do not constitute

46

clear error. The loss determination need only be an estimate . . . " *United States v. St. Luke's Subacute Care Hosp., Inc.*, 178 Fed.Appx. 711, 716, 2006 WL 1208123, 4 (9th Cir. 2006). The same conclusion could not be reached under a clear and convincing standard.

10. **Court Failed to State Clear and Principled Reasons for the Sentence it Imposed, in Violation of Section 3553 - Sentencing**

**Seaton Was Denied Due Process of Law by this Court When it Failed to State Clear and Principled Reasons for the Sentence it Imposed, in Violation of Section 3553 and *Booker*, Making Meaningful Appellate Review for Reasonableness Impossible; Seaton's Appellate Counsel Rendered IAC and IAAC When He Accepted the District Court's Perfunctory Sentencing Statement Made During the Appeal Bond Hearing and Failed to Challenge the District Court's Failure to Adequately Address the Section 3553 Grounds on Appeal, Which Resulted in the Loss of Seaton's Right to Resentencing under *Booker*.**

Sentencing took place prior to *Blakely* and *Booker* and understandably this Court did not engage in the post-*Booker* Section 3553 sentencing factor analysis which is required today. *Booker* objections were raised on direct appeal, but resentencing was denied based on the perfunctory statement made by this Court during a hearing on Seaton's request for an appeal bond, that the Court would have imposed the same sentence under an advisory guideline. At no point did this Court adequately state its reasons for imposition of sentence as required under Section 3553 and this resulted in Seaton being denied meaningful appellate review for reasonableness under *Booker*.

47

*Booker* requires "a showing that the district court considered the statutorily-designated factors in imposing a sentence." *United States v. Knows His Gun*, 438 F.3d 913, 918 (9th Cir. 2006). *United States v. Diaz-Argueta*, 447 F.3d 1167, 1171 (9th Cir.2006), held that the district court did not make a sufficient showing when it failed to address any of the § 3553(a) factors other than the Guideline range when it imposed a sentence within the range. In *Diaz-Argueta*, the district court stated that it had "carefully considered" the PSR, counsel comments, and a memorandum from the defendant. Id. The district court then imposed a sentence within the properly calculated Guideline range, providing no discussion of the applicability of the other § 3553(a) factors or rationale for the sentence. Id. The Ninth Circuit vacated the sentence and held that the mandatory terms of § 3553(a) are not met "by reciting a number taken from a table of the Sentencing Guidelines that are now merely advisory. There is no presumption that such a number has taken into account all of the relevant circumstances that the statute states that the court 'shall consider.' " Id.

In *Booker*, the Supreme Court stated that the Guidelines would no longer apply in a mandatory fashion and that district courts should be guided by the § 3553(a) factors when sentencing. 543 U.S. at 261, 125 S.Ct. 738. On review, the Court of Appeals must determine whether the district court applied the Guidelines in a

48

mandatory fashion, whether it considered the § 3553(a) factors, and whether the resulting sentence is reasonable. When a district court simply adopts a sentence suggested by the Guidelines, makes no reference to the § 3553(a) factors, and provides no discussion of its rationale for the sentence imposed, the Defendant is denied a record upon which the appellate court can engage in meaningful reasonableness review.

An appellate court cannot review a district court's exercise of discretion if the district court does not articulate the reasoning underlying its decision. See *United States v. Johnson*, 388 F.3d 96, 101 (3d Cir.2004). In *United States v. Cooper*, in reviewing a within-the-Guidelines sentence for reasonableness, the Third Circuit held that "the record should demonstrate that the court considered the § 3553(a) factors and any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." 437 F.3d 324, 332 (3d Cir.2006).

Seaton argues that Due Process requires this Court engage in a *de novo* resentencing at which Seaton would be permitted to offer argument in support of the § 3553 factors supporting a reduced sentence and that this Court resentence Seaton, specifically articulating its consideration of the § 3553 factors leading to its determination of sentence to be imposed.

11.  **Application of the *Booker* Remedy to Seaton's Sentencing Constitutes A *de Facto* Sixth Amendment Violation and Violates Due Process - Sentencing.**

**As applied by the District Court and Court of Appeals in Seaton's case, the *Booker* remedy opinion constitutes a *de facto* Sixth Amendment violation, because in fact Seaton was sentenced based on judicially determined factors that were not proved beyond a reasonable doubt by indictment and unanimous jury verdict; the *Booker* remedy opinion itself constitutes a denial of Due Process as applied to Seaton.**

The Booker remedy as applied by the federal courts has resulted in a de facto violation of the Sixth Amendment, because the lower federal courts have in practical effect continued to apply the Guidelines in a mandatory fashion. Booker's remedy for the Sixth Amendment violation caused by judicial fact-finding of facts essential to the determination of the sentence, was to excise 18 U.S.C. § 3553(b)(1), which made the Guidelines mandatory and replace it with the instruction that the Guidelines, henceforth, would be advisory only.

However, as Justice Scalia predicted, the result has been anything but advisory Guidelines.  Instead what has developed in practical application are de facto mandatory Guidelines.  See U. S. Sentencing Commission, Final Report on the Impact of United States v. Booker on Federal Sentencing, (March 2006), found at http://www.ussc.gov/booker_report/Booker_Report.pdf.

When the practical application of a statute results in a constitutional violation, the court is required to fashion a remedy which prevents the constitutional harm.

50

Whatever the standard of scrutiny applicable to a Sixth Amendment violation, whether strict scrutiny (which we suggest is the appropriate standard), intermediate scrutiny or otherwise, the result of the Booker remedy provision has been to de facto incorporate mandatory Guidelines back into the sentencing process. The evidence from the Sentencing Commission is not subject to any other reasonable interpretation, and enough cases have been analyzed at this point (over 76,000 post-Booker sentencings were studied) to enable us to state with confidence that this has been the effect, intended or not. This has been no remedy - - this has been a new wrong.

This Court is familiar with its equitable power to fashion a remedy for governmental action which results in de facto constitutional harms. The remedy is clear - - until Congress acts to rewrite the sentencing statutes to provide a constitutionally permissible sentencing regime, Mr. Seaton, and others similarly situated, is entitled to resentencing utilizing procedures that insure that his Sixth Amendment rights will be safeguarded. Booker has notably failed to achieve that requirement.

A proper remedy is not difficult and is easily implemented. Mr. Seaton's case should be remanded with instructions that he be resentenced under the applicable Guidelines without, however, the application of any guideline enhancement that was not found by a jury beyond a reasonable doubt. This simple mechanism would insure

51

the protection of Mr. Seaton's constitutionally guaranteed liberty as no other remedy has or could.

## CONCLUSION

Guy Roland Seaton respectfully requests this honorable court either summarily vacate his judgment and sentence in accordance with the arguments set forth above or set this matter for an evidentiary hearing.

Respectfully submitted,

THE LAW OFFICE OF
WILLIAM MALLORY KENT

_____
William Mallory Kent
Florida Bar No. 0260738
1932 Perry Place
Jacksonville, Florida 32207-3443
(904) 398-8000 Telephone
(904) 348-3124 Fax
kent@williamkent.com
Appearing *Pro Hac Vice* for Seaton

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on counsel of record by filing the same using the Court's CM/ECF Case Management/Electronic Case Filing this 30th day of May, 2008.

_____
William Mallory Kent